# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed February 28, 1894.

THE CIGARMAKERS' UNION NO. 1 OF BALTIMORE CITY ET. AL.

VS.

FREEMAN BROTHERS.

*Findlay & Mackenzie* for plaintiffs.

*Wm. Pinkney Whyte* and *Martin Lehmayer* for defendants.

WICKES, J.—

The question presented for decision in this case arises under the following circumstances:

On March 6, 1891, the plaintiffs filed their bill in this Court, praying the Court to restrain the defendants from using on their cigars a valuable label of which they claimed to be the proprietors, and which they said the defendants counterfeited and used to their damage. An injunction issued as prayed. A demurrer was filed to the bill and overruled by the Court.

At this stage of the proceedings, the parties to this suit entered into the following agreement: "It is agreed in this case that the demurrer shall be withdrawn, the bill dismissed without prejudice, and the injunction dissolved, on the compliance with the following terms by the defendants.

1. The defendants shall pay the costs.

2. The defendants' employees who are cigarmakers and cigar packers shall become members of the Cigarmakers Union No. 1 of Baltimore City, with all the rights, privileges and lia-

bilities thereto attached, *and the shop of the defendant shall become a union shop with all the rights, privileges and liabilities thereto appertaining.*

3. The defendants shall use the labels of the union only on goods of their own manufacture, and such use shall be restricted to the shop now operated by the defendants in the City of Baltimore, and to such other shops, if any, where the defendants' employ members of the said union, and all sales of goods by the defendants, their agents or employees, containing labels, either genuine or counterfeit, purporting to have been issued by the said Union, where said goods have not been made by members of the said Union, shall be considered as a breach of this agreement."

At the same time the defendants were required to sign a memorandum of conditions upon which the Union label is granted. "Manufacturers desiring the use of the Union label, are required to comply with the following conditions, and pledge themselves to comply with the same. Any violation of the conditions on the part of those who use the label, will subject the person or persons so doing to the deprivation of the use of the same." Then follow five conditions substantially as follows:

That the Union label can only be used by those who employ only Union workmen and pay Union prices for making cigars, and only on the work of Union members. That no manufacturers shall loan or borrow Union labels, or buy or sell them, as the Cigar Makers' International Union claims the sole right of dispensation.

With this understanding the respective parties agreed in writing that the demurrer be withdrawn, "the bill dismissed without prejudice, and the injunction dissolved," and the Court thereupon ordered, May 2, 1891, "that the injunction in above case be and the same is hereby dissolved." The bill not being ordered dismissed.

The defendants organized their cigar factory in accordance with this agreement, and there is no suggestion in the case that they acted otherwise than in entire good faith until December 24, 1892, when they closed their shops. When they reopened, shortly after the new year, it was ascertained that they had introduced a system of cigar mak-

ing called "bunch breaking and roll-ing," not allowed by the Union, and had employed labor not connected with the Union, the Union workmen being prohibited from making cigars in this way. Negotiations were attempted but failed, and on February 2, 1893, the present bill was filed. After reciting the antecedent facts the plaintiff's charge "that the said bill was dis-missed and injunction dissolved on the express condition that the defendant should employ as cigar makers and cigar packers persons who were mem-bers of the said Union, and that their place of manufacture should become a Union shop, and that there was no other consideration passing to your orators to induce them to dismiss the said bill and dissolve the said injunc-tion except the stipulation which the defendants have violated," and prays that it be treated as a trick and con-tempt of Court, and "that they should be compelled to carry out their con-tract and be made to pay unto the said union the sum of money already disbursed and indemnify the union for what may be disbursed on the same ac-count in accordance with the seventh section of the constitution of said union," &c.

In the seventh section referred to, "*the International Union guarantees its moral and pecuniary support to all its members in difficulties between them and their employers*," and this assistance in case of a strike or lock-out is five dollars per week for sixteen weeks, and three dollars per week afterwards until the strike or lockout terminates or the discharged men se-cure work. The plaintiff avers that they had paid out over seven hundred dollars at the time of filing their bill, and have since paid out on the same account a large sum of money. These are the payments for which they seek to be reimbursed in this proceeding. It is admitted that the defendants were never members of the union.

The argument in the case took a very wide range, involving not only the plaintiffs' right of property in their label, a question much disputed in the Courts, and in reference to which the decisions are conflicting, but the right of the organization to be recognized at all, was assailed upon the ground that its constitution shows it to be under the ban of the law as an association

organized for unlawful purposes. In-to these questions it is not necessary to go. As the Act of 1892, which does not, however, apply to this case, ren-ders the first of no practical import-ance, while the second is not essential to the determination of the questions more immediately involved in this con-troversy.

Assuming, therefore, all that the plaintiffs contend for as to their legal status and their proprietary right to the label, the question to be decided lies in a very narrow compass, turning, as it must, upon the true construction of the contract which forms the foundation of this proceeding. The consideration for this contract was the dismissal of the original bill. The order of the Court, however, dissolves the injunction, but is silent as to the bill.

But waiving all questions of consid-eration, let us turn to the agreement between these parties and see precisely what it means and how far it can be enforced.

It is a settled rule in the construc-tion of a contract that the subject matter or the object to be accomplished and the surrounding circumstances must be considered, as well as its terms, in order to ascertain the in-tention of the parties. 62 Md. 163. It is obvious I think that the sole pur-pose of the *plaintiffs* was in the first place to protect their label, and inci-dentally to furnish employment for a large number of their members at the remunerative rates established by their schedule of prices. Hence they said in effect: "You must stop using a label on your cigars which belongs to us, un-less, you agree to employ our men and pay our prices."

The *defendants* manifestly deeming the label of value to their business, but caring not at all for union labor, for they could at any time have se-cured it by complying with union terms, said in effect, "very well we will agree to employ your men and pay your prices and have our cigars made according to your regulations, in order that we may have the benefit of your label."

Both parties secured their object by the agreement. The use of the label therefore was the "right and privi-lege" the defendants obtained by the agreement, and the only question really

for decision in this case is what "liability" the defendants incurred.

The only "breach" referred to in the contract is to result from an improper use of the label—the only "violation" of the conditions contained in the memorandum is also an improper use of the label. So that everything seems to turn upon the use of this union label.

Certainly no reference is made in the contract to the Constitution of the Order, or to any section of it, nor is there one word in the Constitution which imposes upon union shops the payment of anything of this character. The defendants never directly assumed any part of the obligation resting upon the union in its relation to its members under section seven, and never directly or indirectly agreed to pay the "pecuniary support" of union workmen the defendants had ceased to employ. It may well be doubted if the defendants would ever have signed an agreement which by any possible construction required them to pay cigarmakers whether working in their shops or not. Surely such a scope as is given to the "liability" referred to in the contract ought to appear very clearly and precisely upon the face of the contract itself, or be so manifestly the intention of the parties as shown by all the surrounding circumstances as not to leave it equivocal or doubtful.

Now, in equity, as at law, the duty of the Court in constructing a contract is to ascertain the intention of the parties and to give effect to that intention when it is clear. But clear it must be if a Court of equity is to enforce it, 49 Md. 384; 60 Md. 64. There must also be mutuality in a contract to be enforced in equity, a quality in which this seems to be deficient, if the contention of the plaintiffs is correct, 1 Md. ch. 345; 2 Md. ch. 401; 41 Md. 554. Considering, therefore, the circumstances surrounding the parties at the time the agreement was executed—the objects to be attained on both sides—the language of the contract itself, and the distinct relations which the union bore to its own members on the one hand and to the defendants on the other, I am of opinion that the liability referred to in the contract does not embrace, and was not intended to embrace the "pecuniary support" which the Union has given its members, in consequence of the alleged breach of contract by the defendants.

But there are other difficulties in the way of a recovery in this case. The agreement was observed by the defendants for nearly two years. Then, as the defendants testify, it became manifest to them that their business was suffering because of their inability to properly control their workmen, whose dissipated habits, irregular work and wastefulness of material, brought the defendants to a point, as they allege, where they had either to quit business or quit the Union. So they determined to stop using the label and stop employing Union workmen.

The plaintiffs contend, upon the testimony submitted, that this statement is but a pretext, and that the real cause of defendants ceasing to employ their men was because they wanted to introduce a new system of making cigars, called "bunch breaking and rolling," and that, as Union men were not permitted to use this system, the defendants turned them out and employed workmen who were.

I do not see that it makes any material difference, for the purposes of this case, which statement is correct. If the workmen were unmanageable and dissipated, it is admitted the defendants had a right to get rid of them. If, on the other hand, the defendants found the method of cigar making employed by Union men unprofitable, and found it necessary to substitute another method, not allowed by the Union, and therefore other workmen, were they bound by their agreement to go on sacrificing their business interests, when they no longer desired to continue using the Union label, or the employment of Union labor?

If the plaintiff's contention is correct, the contract was intended to run so long as the Union exists and the defendants continue to manufacture cigars. But is such a construction reasonable and fair? No time is specified in the contract during which it shall continue operative, and by all the analogies with other contracts in which no time is fixed, the law supposes that a *reasonable* time was contemplated by the parties. If this rule applies, certainly twenty months must be held sufficiently long to constitute a reasonable time under all the circumstances of this case.

If, on the other hand, it is to be likened to a contract of hiring, as defendants contend, then these workmen being engaged by the week and paid by the week, the rule of law would permit the employer to terminate the contract at the end of any week. McCullough Iron Co. vs. Carpenter, 67 Md. 555.

To hold otherwise would be to tie the hands of these defendants, who have a large capital invested, for an indefinite period, and compel them to conduct their business in a certain way no matter how disastrous, or close their shops.

A contract so unreasonable and oppressive in its operation cannot be enforced in equity, or made the foundation for the recovery of damages. 3 Pomeroy, Eq. Juris. 1405.

Whether a suit for damages can be maintained in equity when the damages are not incidental to other relief sought, is a question not necessary to be decided in this case.

The cases on the subject are collected and commented upon in Wodman vs. Freeman, 25 Maine R. 531. In all the cases I have seen, however, the plaintiffs could sue at law, and were for that reason in part denied a remedy in equity. In this case, the plaintiffs being an unincorporated, voluntary association, must proceed in equity, or not at all. 30 Md. 142.

For other reasons, however, the bill must be dismissed with costs.